**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE, AT NASHVILLE**

| | | |
|---|---|---|
| JEFFREY HUGHES, | § | |
| | § | |
| *Plaintiff*, | § | Case No. 3:22-cv-00238 |
| | § | |
| v. | § | Chief Judge Crenshaw |
| | § | Magistrate Judge Frensley |
| ZANE DUNCAN, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' AMENDED MOTION TO DISMISS [DOC. 21]**

## I. INTRODUCTION

Pending before this Court is the Defendants' Amended Motion to Dismiss (Doc. 21). The Defendant Parole Board Members specifically contend that Mr. Hughes's Complaint should be dismissed on three grounds. *First*, without disclosing that they advanced—successfully—a conflicting position in preceding litigation, the Defendants insist that their already-determined failure to comply with the mandatory provisions of Tennessee's Reentry Success Act of 2021 was "an adjudicatory function" that affords them absolute judicial immunity in this case. *See* Doc. 22 at 9–12. *Second*, the Defendants insist that because the change in Tennessee's applicable parole law under the Reentry Success Act of 2021 was a result of a new statute, they were entitled to at least one free violation and should be granted qualified immunity for their already-determined failure to comply with the mandatory provisions of the Reentry Success Act of 2021 as a result. *See id.* at 12–17. *Third*, the Defendants insist that despite their already-determined violation of the Plaintiff's clearly established federal constitutional right to procedural due process, the Plaintiff has failed to state a claim upon which relief can be granted. *See id.* at 17–20.

-1-

For the reasons detailed below, the Defendants' motion should be denied in all respects. In particular:

1.      Judicial estoppel—along with the previously determined *administrative* nature of the Defendants' misconduct—preclude application of judicial immunity in this case;

2.      The Defendants' refusal to carry out an executive function mandated by statute was administrative in nature, and the Plaintiff's claim is not premised upon any adjudicatory act;

3.      The Plaintiff's federal constitutional right to due process was clearly established at multiple sufficiently specific levels at the time of the Defendants' violation of it—including with respect to the Plaintiff himself—rendering qualified immunity improper; and

4.      The Plaintiff has stated a cognizable claim for relief against each Defendant regarding his federal due process claim, which has already been adjudicated on the merits in the Plaintiff's favor against the Defendants' privy.

For all of these reasons, the Defendants' Motion to Dismiss (Doc. 21) should be **DENIED**.

## II. FACTS

"During the 2021 legislative session, the [Tennessee] General Assembly enacted the Reentry Success Act of 2021, TN LEGIS 410 (201), 2021 Tennessee Laws Pub. Ch. 410[.]" *See* Doc. 1-2 at 2. "The Act constitute[d] a sea change in how parole matters are to be handled in Tennessee for eligible inmates." *See id.* at 9 (emphasis omitted). Most significantly:

> [T]he Reentry Success Act of 2021 amended Tenn. Code Ann. § 40-35-503 to provide that: "Notwithstanding subsection (b), there is a presumption that an eligible inmate **must be released on parole**, except for good cause shown, **upon the inmate reaching the inmate's release eligibility date** or any subsequent parole hearing." *See* TN LEGIS 410 (2021), 2021 Tennessee Laws Pub. Ch. 410 (H.B. 785), at § 12 (emphases added). Thus, an eligible inmate who qualifies under the Reentry Success Act of 2021 has a presumptive statutory right to release on parole "upon the inmate reaching the inmate's release eligibility date" or at any parole hearing after the inmate's release eligibility date, and that presumptive statutory right can only be overcome "for good cause shown." See Tenn. Code Ann.

-2-

§ 40-35-503(i)(1).

*See* Doc. 1 at 5, ¶ 17.

Jeffrey Hughes, the Plaintiff in this matter, "was an 'eligible inmate' within the meaning of the Reentry Success Act of 2021[.]" *See id.* at ¶ 19. Accordingly, "Mr. Hughes was entitled— as a matter of statutory right—to 'be released on parole, except for good cause shown, upon [] reaching [his] release eligibility date . . . .'" *Id.* (quoting Tenn. Code Ann. § 40-35-503(i)(1)).

"Mr. Hughes reached his release eligibility date on September 30, 2021." *Id.* at ¶ 20. "Notwithstanding Mr. Hughes' constitutionally protected liberty interest in being released on parole upon reaching his release eligibility date on September 30, 2021," though, "the Defendants did not cause Mr. Hughes to be released on parole upon reaching his release eligibility date on September 30, 2021." *Id.* at ¶ 22. "The Defendants also did not hold a hearing during which they showed—or even attempted to show—good cause to overcome the Reentry Success Act's statutory presumption that Mr. Hughes be released on parole upon reaching his September 30, 2021 release eligibility date." *Id.* at ¶ 23. Critically, the Defendants also took this unconstitutional approach even *after* the Davidson County Chancery Court ruled—on September 24, 2021—that: "The Court's interpretation of the plain meaning of [the Reentry Success Act's] language is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date." *See* Doc. 1-2 at 8. Thus, despite that specific determination in Mr. Hughes' own case, the Defendants did not release or consider the Plaintiff for release upon reaching his September 30, 2021 release eligibility date, thereby causing Mr. Hughes to spend three additional months in prison in violation of his clearly-established and already-adjudicated rights. *See* Doc. 1 at 1, ¶ 1.

"Despite a known statutory obligation to cause Mr. Hughes to be released on parole upon reaching his September 30, 2021 release eligibility date absent a showing of good cause to deny

him parole, the Defendants did not cause Mr. Hughes to be released on parole upon reaching his September 30, 2021 release eligibility date." *See id.* at 8, ¶ 34. Nor did the Defendants attempt to meet their evidentiary burden to show good cause to deny Mr. Hughes parole by or before he reached his release eligibility date. *See id.*

Instead, the Board delayed scheduling a Reentry Success Act-compliant parole hearing for Mr. Hughes until "November 29, 2021"—more than two months after he reached his release eligibility date. *See id.*; *see also* Doc. 1-5. "The Board was capable of affording Mr. Hughes a hearing before that time," but it declined to do so. *See* Doc. 1 at 8, ¶ 34. At Mr. Hughes' belated November 29, 2021 hearing, the Board also did not even "attempt to show good cause to deny Mr. Hughes parole[.]" *See id.* at 10, ¶ 45. "Following that hearing, after determining that Mr. Hughes was indeed entitled to be released on parole, the Tennessee Board of Parole then caused the Plaintiff to remain incarcerated until December 27, 2021." *Id.* at 2, ¶ 4.

The Defendants' failure to comply—or even attempt to comply—with the provisions of the Reentry Success Act of 2021 were not a product of any adjudicatory decision. Instead, as the Board itself argued, *see infra* at 5–6, and as the Davidson County Chancery Court repeatedly determined, the Board's decision was an "administrative" one, *see* Doc. 1-2 at 9, it was made following an "administrative meeting," *id.* at 4, and it was made "because of administrative convenience." *See id.* at 8.

Put another way: The Defendants did not adjudicate—or even purport to adjudicate—anything. Instead, the Defendants claimed, through counsel, that they simply "did 'not have the ability or resources necessary' to hold Reentry Success Act-compliant hearings for inmates" like Mr. Hughes. *See* Doc. 1 at 6, ¶ 24. *See also* Doc. 1-2 at 7 ("the Court is unclear upon what basis the Board is denying a request for a new hearing other than its limited 'ability or resources' to do

so for everyone the Act may affect. While the Court is sympathetic to this concern, this does not excuse the State from appropriately and consistently applying the Act to eligible inmates."). Because certiorari review of an administrative decision afforded the Defendants—who are in privity with the Board of Parole, *see id.* at 7, ¶ 33—the best possible standard of review in state court, the Board of Parole also contended repeatedly and successfully in the preceding litigation that their decision was *not* adjudicatory in nature and was *not* a parole decision. *See, e.g.,* **Ex. #1** (Sep. 17, 2021 Brief of the Board of Parole in Opposition to the Writ of Certiorari), at 13–14 ("When Petitioner's attorney appeared at the Board's June 23, 2021 **administrative meeting** to discuss this petition, **nothing about the meeting indicates that it was an adjudicatory hearing on a parole decision**. . . . The Board took no action on the petition at that meeting nor indicated that it intended to consider or render a decision on the petition. **Nor is there anything in the record showing that an official decision was made by the Board on the petition**, unlike the documentation generated when the Board decided to deny Petitioner parole in July 2020. **Nothing about the June 23, 2021 administrative meeting or any event that occurred thereafter constitutes a 'parole decision'** . . . .") (emphases added; internal citations omitted). *See also id.* at **Ex. #2** (Board of Parole's Sep. 7, 2021 Memorandum of Law in Support of its Motion to Dismiss the Writ of Certiorari), at 5 ("Petitioner's counsel appeared before the Board at its June 23, 2021 administrative meeting and requested the same relief. The Board took no action on Petitioner's requests at that meeting.") (internal citation omitted); *id.* at 8 ("Petitioner's attorney appeared at the Board's June 23, 2021 administrative meeting to discuss the petition. **This was not a hearing to determine whether Petitioner was eligible for parole nor to determine whether to grant him parole**.") (emphasis added; internal citations omitted); *id.* at 6 ("Judicial review of an action taken by an administrative body like the Board is accomplished through the common law writ of

-5-

certiorari. . . . In order to seek review, a petition for certiorari must be filed within sixty days of the entry of the administrative body's decision.") (internal citations omitted); *id.* at 8 ("In this case, no adjudicatory hearing was held"); *id.* ("there is no parole decision related to the June 2021 events that is subject to judicial review[.]")

Thus, this lawsuit does not arise out of an adjudicatory decision, but an administrative one. The Defendants' administrative actions and omissions regarding Mr. Hughes also were not a product of Board regulations seeking to implement the provisions of the Reentry Success Act based on a competing, good-faith interpretation of the statute. To the contrary, even after the Reentry Success Act took effect and made release on parole a "presumptive statutory right" for Mr. Hughes and other eligible inmates, *see* Doc. 1 at 5, ¶ 17, the Defendants continued to apply "out of date" regulations that provided—contrary to the Reentry Success Act's central provision— that release on parole was a privilege and not a right. *See* Doc. 1-2 at 8, n.1 ("Petitioner points out that the applicable regulations do not reflect this change. The last amendments were made on March 22, 2020. Tenn. Comp. R. & Regs. 1100-01-01 (administrative history). They are, indeed, out of date and do not reflect the changes to the parole system made through the Act. Thus, any reliance on them as authority for the Court, if inconsistent with the Act, would be misplaced.").

Upon review, the Davidson County Chancery Court determined in a final and unappealed September 24, 2021 merits order that the Board of Parole's approach to Mr. Hughes was:

> [I]nconsistent with all principles of due process and of the obligation of the State to "'follow the laws of the State of Tennessee as well as its own rules, and that inmates are entitled to whatever due process arises as a result of the proper application of state statutes and the rules.'" *Greenwood v. Tenn. Bd. of Parole*, 547 S.W.3d 207, 214-15 (Tenn. Ct. App. 2017) (quoting *Wells v. Tenn. Bd. of Paroles*, 909 S.W.2d 826, 829 (Tenn. Ct. App. 1995)).

*See* Doc. 1-2 at 8. Thereafter—*months after* Mr. Hughes' September 30, 2021 release eligibility date—the Defendants "issued a Parole Certificate that prevented Mr. Hughes from being released

until "12/27/2021," *see* [Doc. 1-7]—thereby depriving Mr. Hughes of the opportunity to spend Christmas with his family." *See* Doc. 1 at 8, ¶ 35. The Tennessee Department of Correction was "not [] able to discern why the Board chose December 27 as the authorized date for release to parole for Mr. Hughes, but that's the date the Department is presently bound by." *See* Doc. 1-8 at 1. Thus, "[a]s a result of the Defendants' violation of Mr. Hughes' clearly established constitutional right to due process of law, Mr. Hughes spent an additional three months in prison during a deadly pandemic; he was deprived of the opportunity to spend the Thanksgiving and Christmas holidays at home with his wife and children; and he incurred legal fees and costs." *See* Doc. 1 at 11, ¶ 51. This action followed.

### III. LEGAL STANDARD

The Defendant's motion to dismiss under Rule 12(b)(6) is subject to familiar standards. "Under Rule 12(b)(6), the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs." *Nwanguma v. Trump*, 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). "To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gulfside Casino P'ship v. Churchill Downs Inc.*, No. 20-6423, 2021 WL 2550402, at *2 (6th Cir. June 22, 2021) (cleaned up).

"By the plain terms of § 1983, two—and only two—allegations are required in order to state a cause of action under that statute." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Id.* (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961)). *See also Sigley v. City of Parma Heights*, 437

F.3d 527, 533 (6th Cir. 2006) ("To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."). Here, because the Plaintiff "has made both of the required allegations," *id.*, and because the Defendants' immunity claims fail as a matter of both law and fact, the Defendants' motion to dismiss must be denied.

## IV. ARGUMENT

**A.** **The Defendants are judicially estopped from asserting that their actions were adjudicative.**

The Sixth Circuit has explained that "the doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *See Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). The "under oath" requirement is construed broadly and non-literally. Thus, "the 'under oath' requirement is met when a party previously asserted an inconsistent position in a written filing and argued the motion on the merits before the court." *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 245 (6th Cir. 2021), *cert. denied sub nom. Baker v. Shufeldt*, 142 S. Ct. 347, 211 L. Ed. 2d 185 (2021) (quoting *Valentine-Johnson v. Roche*, 386 F.3d 800, 812 (6th Cir. 2004) ("Air Force's written filing, combined with arguing the merits of its motion in a conference with the MSPB AJ, may be fairly analogized to taking a position 'under oath' for the purposes of judicial estoppel.") (citing *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 30–31 (1st Cir.2004))). *See also In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 482 (6th Cir. 2019) (rejecting the argument that judicial estoppel does not apply unless the prior inconsistent statement

was made during sworn testimony as being "overly technical," especially "in the context of an equitable doctrine that is 'not reducible to any general formulation of principle' and for which 'there are no inflexible or exhaustive prerequisites for determining its applicability'").

Here, the Defendants are judicially estopped from claiming that their actions were not administrative in nature and were made pursuant to "an adjudicatory hearing on a parole decision[,]" having repeatedly advanced contrary positions in the preceding litigation. *See, e.g.,* **Ex. #1** at 13–14 ("When Petitioner's attorney appeared at the Board's June 23, 2021 **administrative meeting** to discuss this petition, **nothing about the meeting indicates that it was an adjudicatory hearing on a parole decision**. . . . The Board took no action on the petition at that meeting nor indicated that it intended to consider or render a decision on the petition. **Nor is there anything in the record showing that an official decision was made by the Board on the petition**, unlike the documentation generated when the Board decided to deny Petitioner parole in July 2020. **Nothing about the June 23, 2021 administrative meeting or any event that occurred thereafter constitutes a 'parole decision'** . . . .") (emphases added; internal citations omitted). *See also id.* at **Ex. #2** at 5, 6, & 8.

At that time, of course, the Defendants also benefited from characterizing their acts as administrative and non-adjudicative. For one thing, it gave them the most favorable possible standard of review that exists under Tennessee law. *See, e.g., Hill v. City of Germantown*, No. W2009-00308-COA-R3-CV, 2010 WL 1240436, at *13 (Tenn. Ct. App. Mar. 31, 2010) ("If any possible reason exists to justify the administrative decision, it must be upheld[.]"). For another, it gave them a basis—or so they thought—for asserting that judicial review of their decision was not available because they had not adjudicated anything. *See* **Ex. #2** at 8 (arguing that: "Therefore, there is no parole decision related to the June 2021 events that is subject to judicial review, and

this Court does not have jurisdiction to adjudicate the writ of certiorari."). *See also* **Ex. #1** at 13–14; **Ex. #2** at 5, 6, & 8. Upon review, the Chancery Court held that the Defendants' actions constituted "an administrative decision[,]" and it applied the deferential standard of review that governs administrative decisions, but it also determined, contrary to the Board's argument on the matter, that judicial review of the Board's administrative actions was available. *See* Doc. 1-2, at 9; *id.* at 4.

Under these circumstances, judicial estoppel precludes the Defendants from changing horses. When it benefited them in previous litigation, they insisted that their actions were a result of an "administrative meeting" that did <u>*not*</u> result in "an adjudicatory hearing on a parole decision[,]" and that no "official decision was made by the Board" that would constitute an adjudicatory "'parole decision.'" *See* **Ex. #1** at 13–14. The Defendants also asserted and argued that position across multiple written filings. *See id*; *see also* **Ex. #2** at 5, 6, & 8. The Chancery Court thereafter adopted the Defendants' claim on the matter as part of its disposition, which benefited the Defendants by affording them an extraordinarily lenient standard of review. *See* Doc. 1-2, at 9; *id.* at 4. Accordingly, the Defendants are judicially estopped from maintaining here—180 degrees contrary to their original position—that the Plaintiff's claim *actually* arises out of an "adjudicatory act[.]*" See* Doc. 20 at 10; *Browning*, 283 F.3d at 775. Thus, absolute judicial immunity cannot apply, because having thoroughly repudiated the claim when it benefited them, the Defendants are estopped from asserting that their decision was adjudicative in any respect.

**B.**     <u>**The doctrine of *res judicata* precludes the Defendants from asserting that their actions were adjudicative.**</u>

For similar reasons, the doctrine of *res judicata* precludes the Defendants from asserting that their actions and omissions giving rise to this lawsuit were judicial in nature.

Res judicata (also referred to as "claim preclusion") precludes a claim raised in

a subsequent proceeding where there is: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action."

*Stanislaw v. Thetford Twp., Michigan*, No. 20-1660, 2021 WL 3027195, at *3 (6th Cir. July 19, 2021) (quoting *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577-78 (6th Cir. 2008) (internal citations omitted)). Here, each element is established.

*First*, the Davidson County Chancery Court's September 24, 2021 *Memorandum and Order* was a final decision on the merits by a court of competent jurisdiction. *See* Doc. 1-2. The Defendants did file a post-judgment motion to alter or amend it, but they failed to serve it properly and neither prevailed nor appealed. *See generally* **Ex. #3** (Nov. 22, 2021 Memorandum and Order).

*Second*, this is a subsequent action between the same parties or their privies. *See* Doc. 1-2. *See also* Doc. 1 at 7, ¶ 33 ("Each Defendant is a member of—and in privity with—the Tennessee Board of Parole, which was the Respondent in Davidson County Chancery Court Case No.: 21-0618-II, *Jeffrey Wayne Hughes v. Tennessee Board of Parole*.").

*Third*, the administrative and non-adjudicative nature of the Defendants' actions and omissions giving rise to the Plaintiff's claim in this case was actually litigated in the prior action. *See supra* at 8–10. It also could have been and needed to be litigated there, because the character of the Board's actions affected the scope and nature of the Chancery Court's review.

*Fourth*, there is an identity of the causes of action between the actions. The Plaintiff's original petition for a writ of certiorari maintained—successfully—that the Defendants' actions and omissions violated the Plaintiff's constitutional right to due process of law. *See* Doc. 1-2 at 8–9 (holding that the Defendants' actions were "inconsistent with all principles of due process and

-11-

of the obligation of the State to follow the laws of the State of Tennessee as well as its own rules, and that inmates are entitled to whatever due process arises as a result of the proper application of state statutes and the rules[,]" and that "[t]he Board's action denied Mr. Hughes the opportunity to exercise his substantive rights at a meaningful time and in a meaningful manner as due process requires.") (cleaned up). This action, for its part, is premised upon an identical claim arising from identical facts. *See* Doc. 1 at 9–11.

For all of these reasons, *res judicata* applies. Thus, the Defendants' claim of absolute judicial immunity cannot apply, because the administrative and non-adjudicative nature of the actions and omissions regarding which the Defendants have been sued—an issue that was actually litigated in the previous proceeding, *see* Doc. 1-2, at 9; *id.* at 4—is *res judicata* against them.

## C. **The Reentry Success Act of 2021 imposed ministerial, mandatory, executive obligations upon the Defendants that the Defendants failed to meet.**

As the Board of Parole is normally fond of emphasizing, "the [Tennessee] Legislature makes clear what the Board may and may not do." *Swatzell v. Tennessee Bd. of Parole*, No. 3:18-CV-01336, 2022 WL 209740, at *2 (M.D. Tenn. Jan. 21, 2022). Usually, that means denying inmates parole, because for most inmates, "the Legislature reiterates that 'parole is a privilege and not a right' and creates a fence within which the Board shall exercise its discretion in Tenn. Code Ann. § 40-35-503(b)(2)." *See id.*

In 2021, however, with respect to a narrow category of non-violent inmates who do not have recent disciplinary infractions, the Tennessee General Assembly materially altered the law, affording such inmates a presumptive right to release on parole "upon the inmate reaching the inmate's release eligibility date." *See* Tenn. Code Ann. § 40-35-503(h) ("Notwithstanding subsection (b), **there is a presumption that an inmate convicted of a Class E or Class D nonviolent felony offense is to be released on parole upon the inmate reaching the inmate's**

-12-

**release eligibility date unless good cause is shown as to why the inmate should not be released.**") (emphasis added); Tenn. Code Ann. § 40-35-503(i)(1) ("Notwithstanding subsection (b), there is a presumption that **an eligible inmate must be released on parole, except for good cause shown**, upon the inmate reaching the inmate's release eligibility date or any subsequent parole hearing.") (emphasis added). In particular:

> [T]he Reentry Success Act of 2021 amended Tenn. Code Ann. § 40-35-503 to provide that: "Notwithstanding subsection (b), there is a presumption that an eligible inmate **must be released on parole**, except for good cause shown, **upon the inmate reaching the inmate's release eligibility date** or any subsequent parole hearing." *See* TN LEGIS 410 (2021), 2021 Tennessee Laws Pub. Ch. 410 (H.B. 785), at § 12 (emphases added). Thus, an eligible inmate who qualifies under the Reentry Success Act of 2021 has a presumptive statutory right to release on parole "upon the inmate reaching the inmate's release eligibility date" or at any parole hearing after the inmate's release eligibility date, and that presumptive statutory right can only be overcome "for good cause shown." *See* Tenn. Code Ann. § 40-35-503(i)(1).

*See* Doc. 1 at 5, ¶ 17.

Thus, under this framework, when an inmate who is eligible under the Reentry Success Act reaches his or her release eligibility date, the Tennessee Legislature has given members of the Tennessee Board of Parole either of two mandatory options. In particular, the Board can either:

1. Hold a hearing and establish "good cause" to overcome the "presumption that an eligible inmate must be released on parole[,]" *see* Tenn. Code Ann. § 40-35-503(i)(1); or

2. Release the inmate on parole.

Significantly, if the Board pursues the first option and determines, upon review, that good cause has been shown to decline parole, the Defendants must also "state in writing the reason for declining parole and how the inmate can improve the inmate's chance of being released on parole in the future." *See* Tenn. Code Ann. § 40-35-503(j) ("Upon declining to grant parole in any case, the board must state in writing the reason for declining parole and how the inmate can improve the

-13-

inmate's chance of being released on parole in the future.").

With this context in mind, under the Reentry Success Act of 2021, the Tennessee Legislature has continued to "make[] clear what the Board may and may not do." *Swatzell*, 2022 WL 209740, at *2. And as the Davidson County Chancery Court has already determined, *see* Doc. 1-2, one of the things that the Board "may not do" is what the Defendants did to Mr. Hughes. Specifically, the Board "may not": (1) refuse to hold a hearing upon an inmate reaching his release eligibility date; (2) refuse to establish or even attempt to establish good cause to deny that inmate parole; *and also* (3) refuse to release the inmate on parole upon reaching his release eligibility date, as they are required to do pursuant to a mandatory, non-discretionary, ministerial duty in the absence of establishing good cause to deny release. That is what the Defendants did to Mr. Hughes, however. The Defendants also adopted this approach not based on some adjudicatory or discretionary determination, but because complying with their statutory mandate would have been expensive, and (they asserted) they "did 'not have the ability or resources necessary' to hold Reentry Success Act-compliant hearings for inmates" like Mr. Hughes. *See* Doc. 1 at 6, ¶ 24. *See also* Doc. 1-2 at 7 ("the Court is unclear upon what basis the Board is denying a request for a new hearing other than its limited 'ability or resources' to do so for everyone the Act may affect. While the Court is sympathetic to this concern, this does not excuse the State from appropriately and consistently applying the Act to eligible inmates.").

Put another way: What the Defendants did to Mr. Hughes has "no functional tie to the judicial process . . . ." *Buckley v. Fitzsimmons*, 509 U.S. 259, 277 (1993). Instead, due to cost constraints, *see* Doc. 1 at 6, ¶ 24—and without adjudicating or purporting to adjudicate anything—the Defendants opted to violate mandatory statutory obligations, which required the Board either to hold a hearing or release Mr. Hughes on parole upon reaching his September 30, 2021 Release

-14-

Eligibility Date. With respect to Mr. Hughes, the Board did neither one.

Because the Defendants declined to hold a hearing and neglected even to attempt to satisfy their burden of showing good cause to deny Mr. Hughes parole, the Board's legislative mandate—that Mr. Hughes "is to be" and "must be" released on parole by September 30, 2022—was unambiguously defined by statute. *See* Tenn. Code Ann. § 40-35-503(h); Tenn. Code Ann. § 40-35-503(i)(1). That mandatory duty—which simply required verifying that the Board had not held a hearing at which it showed good cause to deny Mr. Hughes parole—is properly characterized as administrative, executive, and ministerial. *See, e.g., Simon v. Ward*, No. CIV. A. 99-1554, 2001 WL 41127, at *3 (E.D. Pa. Jan. 16, 2001) ("District courts within the Third Circuit also have held that executive/ministerial duties include carrying out a mandatory statutory duty such as verifying information in a parolee's record") (citing *Jones v. Johnson*, 402 F. Supp. 992, 998 (E.D. Pa. 1975) (holding that "[w]hen the function is purely mandatory, in accordance with the direct and positive legal authority applicable to the individual's position, and without any discretion involved in its performance," it "is not a function involving policymaking or judgmental elements.")); *Baxter v. Com.*, 359 Mass. 175, 179, 268 N.E.2d 670, 673 (1971) ("In **administering** parole, the parole board performs a wholly executive function.") (emphasis added).

However characterized, though, the Defendants' actions were unmistakably: (1) nonjudicial—"i.e., actions not taken in" any judicial capacity—and (2) "taken in the complete absence of all jurisdiction" afforded by the Tennessee General Assembly.[1] *Cf. Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012) ("Judicial immunity can be overcome under only two circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not

---

[1] As noted, notwithstanding a clearly defined statutory mandate, the Defendants acted pursuant to "out of date" regulations that did not reflect current law, *see* Doc. 1-2 at 8, n.1, and they indicated through counsel that they would not comply with current law due to resource constraints. Doc. 1 at 6, ¶ 24.

taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.") (cleaned up). Both defects preclude application of judicial immunity under circumstances—like this one—when the Defendants have not been sued for making any sort of adjudicative decision pursuant to their decision-making powers. *See Draine v. Leavy*, 504 F. App'x 494, 496 (6th Cir. 2012). Thus, the Defendants' failure to comply with a non-adjudicative statutory duty, "as explicitly and specifically mandated in the laws of [Tennessee], is not protected from civil rights suits by any form of governmental immunity[.]" *Jones*, 402 F.Supp. at 999. *Cf. Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) ("Almenas is not entitled to absolute immunity. Parole officers are entitled to absolute immunity when they perform judicial functions. . . . Almenas did not make an adjudicative decision to revoke Scotto's parole."). The Defendants' absolute judicial immunity claim fails accordingly.

### D.     The Defendants are not protected by qualified immunity.

When government officials are acting within the scope of their discretion, they lose the protection of qualified immunity when their unlawful conduct violates clearly established constitutional rights. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). Because the Defendants were not acting within the scope of their discretion, though—and independently because the Defendants' unlawful conduct violated Mr. Hughes' clearly established constitutional right to due process of law—qualified immunity does not bar the Plaintiff's due process claim.[2]

---

[2] The Plaintiff also expressly raises and preserves the argument that because qualified immunity, as a doctrine, lacks historical or textual justifications, *see Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (Thomas, J., dissenting from the denial of certiorari); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869 (2017) (Thomas, J., concurring), "lacks legal justification," William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 88 (2018), and "is historically unmoored, ineffective at achieving its policy ends, and detrimental to the development of constitutional law[,]" *see* Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797, 1836 (2018), the entire "kudzu-like creep of the modern [qualified] immunity regime" should be overruled. *See Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring), *withdrawn on rehearing Zadeh v. Robinson*, 928 F.3d 457 (5th Cir. 2019).

1.     The Defendants misconstrue Mr. Hughes' Due Process claim.

As a threshold matter, Mr. Hughes emphasizes that the Defendants have materially mischaracterized his due process claim. The Defendants assert that Mr. Hughes contends that "the Reentry Success Act required immediate reconsideration of Plaintiff's parole status and that a failure to reschedule Plaintiff's July 2022 hearing after passage of the Act violated due process." Doc. 22 at 14. This is materially wrong, though. Instead, Mr. Hughes has asserted that the Reentry Success Act required the Defendants *either*: (1) to hold a hearing and establish "good cause" to overcome the "presumption that [Mr. Hughes] must be released on parole" upon reaching his September 30, 2021 release eligibility date, *see* Tenn. Code Ann. § 40-35-503(i)(1); or (2) to release Mr. Hughes on parole upon reaching his September 30, 2021 release eligibility date. The Defendants, however, did neither one. The Defendants also continued to deny Mr. Hughes parole without a hearing for several months *even after* the Davidson County Chancery Court ruled—on September 24, 2021—that: "The Court's interpretation of the plain meaning of [the Reentry Success Act's] language is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date." *See* Doc. 1-2 at 8.

2.     The Defendants acted beyond the scope of their discretionary authority.

Qualified immunity only applies to defendants who are acting within their official scope of authority while exercising discretionary functions. *See Blake v. Wright*, 179 F.3d 1009, (6th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). Thus, "[q]ualified immunity does not attach when an official manifestly 'act[s] outside his discretionary authority.'" *Haywood v. Hough*, 811 Fed.Appx. 952, 957–58 (6th Cir. 2020) (quoting *Gravely v. Madden*, 142 F.3d 345, 347 (6th Cir. 1998)). Federal courts "look to state law to determine the scope of a state official's discretionary authority." *Id.* at 958 (citing *Gravely*, 142 F.3d at 347–48; *Sell v. City of*

-17-

*Columbus*, 47 F. App'x 685, 692–93, 695–96 (6th Cir. 2002)).  Further, "'[a] defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority.'"  *Id.* (quoting *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019)).

As an initial matter, the Defendants have failed to put forth facts suggesting that they acted within the scope of their discretionary authority.  Indeed, in the preceding litigation, the Defendants insisted that they had no discretion on the issues presented by this lawsuit at all.  *See* **Ex. #2** at 10 ("the Board's Rules and Regulations do not provide authority for the Board to reopen its decision to deny Petitioner parole.").  As the Chancery Court noted, the Defendants were also acting pursuant to "out of date" regulations that conflicted with current law.  *See* Doc. 1-2 at 8, n.1.

Regardless, the unambiguously mandatory terms of the Reentry Success Act narrowly restricted the scope of the Defendants' authority, affording them only two options when Mr. Hughes reached his release eligibility date.  *See* Tenn. Code Ann. § 40-35-503(i)(1) ("Notwithstanding subsection (b), there is a presumption that **an eligible inmate must be released on parole, except for good cause shown, upon the inmate reaching the inmate's release eligibility date** or any subsequent parole hearing.") (emphasis added).  *See also* Doc. 1-2 at 8 ("the plain meaning of this language is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date.").  Under these circumstances, the Defendants' decision to comply with *neither* option—and to keep Mr. Hughes imprisoned without even attempting to meet its evidentiary burden at a hearing once he reached his release eligibility date instead—was not plausibly within the scope of the Defendants' discretion.  *See id.*  *Cf. Swatzell*, 2022 WL 209740, at *2 (noting that Tennessee's parole statute "creates a fence within which the Board shall exercise its discretion").  That is particularly true as to the Defendants' actions between September 30, 2021 (the date Mr. Hughes reached his release eligibility) and December 27, 2021 (the date of

Mr. Hughes' ultimate release), given that the Davidson County Chancery Court had already ruled—on September 24, 2021—that "[t]he Court's interpretation of the plain meaning of [the Reentry Success Act's] language is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date." *See* Doc. 1-2 at 8.

Thus, by both refusing to afford Mr. Hughes a Reentry Success Act-compliant hearing upon reaching his release eligibility date *and* refusing to release Mr. Hughes on parole upon reaching his release eligibility date, the Defendants were not acting pursuant to any state law authority—discretionary or otherwise—whatsoever. *See Haywood*, 811 Fed.Appx. at 957–58. The Defendants also have not put forth facts demonstrating that they were. *Id.* at 958. Under these circumstances, the Defendants have failed to meet their initial burden of demonstrating that qualified immunity even *can* apply to the Plaintiff's claims. Their qualified immunity defense should be denied accordingly.

  3. <u>Clearly established law precluded the Defendants' actions.</u>

    **a. The recency of the Reentry Success Act—which restored a previously and clearly established constitutional right—did not afford the Defendants one free Due Process violation.**

"When a legislature abolishes a law, it is not that the prior law never was a law; rather it is that a prior law is no longer the law." *Greyhound Food Management Inc. v. City of Dayton*, 852 F.2d 866, 870 (6th Cir. 1988). By the same token, when a legislature reenacts the same or essentially the same statute, the prior statute—including judicial interpretations of it—again become law. *See Mann Construction, Inc. v. United States*, 27 F.4th 1138, 1147 (6th Cir. 2022) (citing *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). The legislature is also presumed to be aware of previous judicial interpretations of a statute, and those interpretations still apply upon reenactment of the same or essentially the same statute in the future. *See Bragdon v. Abbott*, 524

U.S. 624, 644-45 (1998) (holding that "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well[,]" and applying that precedent allows courts to reach conclusions in line with "the most faithful way to effect the [legislative] design.").

As relevant to the Plaintiff's due process claim, the Reentry Success Act of 2021 *reinstated* a clearly established constitutionally protected liberty interest in a presumption of parole for qualifying inmates. Tennessee law initially afforded inmates that presumption, but the legislature eliminated it in 1985 in response to a Sixth Circuit decision clearly establishing the constitutional right involved. *See Phelps v. Traughber*, 81 F.3d 161 (6th Cir. 1996) ("In response to the *Mayes* decision, the Board amended its rules to eliminate any liberty interest by eliminating the language that created a presumption that a resident would be released on parole when he was first eligible. The new Rule became effective on April 10, 1985."). Before that, however, the Sixth Circuit clearly established that a presumption of parole is a liberty interest protected by the federal Constitution that cannot be denied without a constitutionally compliant hearing. *See Mayes v. Trammell*, 751 F.2d 175, 179 (6th Cir. 1984) ("we hold that the overall Tennessee parole scheme, particularly rule 1100–1–1–.06 of the Rules of Tennessee Board of Parole, does create a liberty entitlement protected by the due process clause. . . . The Tennessee parole scheme, by virtue of its 'presumption' of parole release and its virtual mirroring of the language of the Nebraska statute at issue in *Greenholtz*, creates such an expectation of parole release as to allow the conclusion that the Tennessee parole rules do indeed create a liberty interest.").

Under these circumstances, the Reentry Success Act of 2021 served to reinstate the presumption of parole—and the clearly established constitutional liberty interest that came with

it—for eligible inmates like Mr. Hughes, whose eligibility under the Act has never been in dispute. Further, by denying Mr. Hughes a hearing *entirely* upon reaching his release eligibility date, the Defendants committed a constitutional violation that was significantly *worse* than the violation established by *Mayes*—a case that arose from denying an inmate with a presumption of parole the ability "to present any evidence at his parole hearing[,]" rather than denying him a hearing completely. *See id.* (emphasis added). Additionally, where governmental deprivation of a constitutionally protected liberty interest is involved, the principle that "[n]otice and an evidentiary hearing, as provided under [a] statute, are the touchstones of procedural due process" has been clearly established for decades, *see Kratt v. Garvey,* 342 F.3d 475, 483 (6th Cir. 2003) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)), and the Defendants do not contend otherwise.

Put another way: *Mayes* clearly established that a statutory presumption of parole upon an inmate reaching his release eligibility date is a protected liberty interest that can only be denied in a constitutionally compliant hearing. For qualifying inmates like Mr. Hughes, the Reentry Success Act of 2021 also reinstated that presumption of parole upon an inmate reaching his release eligibility date unless the Board of Parole shows good cause to deny release. *See* Tenn. Code Ann. § 40-35-503(h); Tenn. Code Ann. § 40-35-503(i)(1). Even so, the Defendants did not release Mr. Hughes on parole upon reaching his release eligibility date. They also did not hold a hearing at which they attempted to meet their burden to deny him release. Instead, they kept him incarcerated for months beyond what a mandatory statute required of them without affording Mr. Hughes a hearing at all. The Sixth Circuit's decision in *Mayes*, 751 F.2d at 179, clearly established the illegality of that course of action, and the Defendants' one-free-violation theory fails accordingly.

### b. Mr. Hughes' rights were established with specificity.

Independent of *Mayes*, and in addition to it, the Due Process violation involved in this case was also established with the sufficient specificity in several respects. To begin, the Tennessee Court of Appeals has long "determined that 'the Board of Paroles is obligated to follow the laws of the State of Tennessee as well as its own rules, and that inmates are entitled to whatever due process arises as a result of the proper application of the state statutes and the rules.'" *Greenwood v. Tennessee Board of Parole*, 547 S.W.3d 207, 215 (Tenn. Ct. App. 2017) (quoting *Wells v. Tenn. Bd. of Paroles*, 909 S.W.2d 826, 829 (Tenn. Ct. App. 1995)).

Here, however, the Defendants' denial of Mr. Hughes' due process rights was not actually the product of a competing interpretation of an applicable statute. Instead, the Defendants complained, through counsel, that complying with their statutory mandate would be expensive, and (they asserted) they "did 'not have the ability or resources necessary' to hold Reentry Success Act-compliant hearings for inmates" like Mr. Hughes. *See* Doc. 1 at 6, ¶ 24. *See also* Doc. 1-2 at 7 ("the Court is unclear upon what basis the Board is denying a request for a new hearing other than its limited 'ability or resources' to do so for everyone the Act may affect. While the Court is sympathetic to this concern, this does not excuse the State from appropriately and consistently applying the Act to eligible inmates."). Thus, the Defendants not only abridged Mr. Hughes' clearly established right to "the proper application of the state statute[]" involved, *see Greenwood*, 547 S.W.3d at 215; they also made clear that they would not comply with that statute at all.

Nor was the Defendants' denial of Mr. Hughes' due process rights a product of a Board rule based upon some competing good-faith interpretation of the Reentry Success Act. *Cf. id.* If, following notice and comment, the Board had adopted a Rule based upon a competing interpretation of the statute and applied that Rule to Mr. Hughes, this may well be a different case.

But that is not what happened. Instead, the Board simply opted *not to update its materially out-of-date regulations* after the Reentry Success Act was enacted, and it applied its out-of-date regulations—which directly conflicted with Mr. Hughes' statutorily-established presumptive right to parole—instead. *See* Doc. 1-2 at 8, n.1 ("Petitioner points out that the applicable regulations do not reflect this change. The last amendments were made on March 22, 2020. Tenn. Comp. R. & Regs. 1100-01-01 (administrative history). They are, indeed, out of date and do not reflect the changes to the parole system made through the Act. Thus, any reliance on them as authority for the Court, if inconsistent with the Act, would be misplaced."). This, too, violated Mr. Hughes' clearly established right to "proper application" of the rules governing Tennessee law regarding parole. *See Greenwood*, 547 S.W.3d at 215.

Finally, at the lowest level of generality and greatest degree of specificity possible, the Defendants continued to violate Mr. Hughes' due process rights *even after the Chancery Court ruled on his specific claim against them*. As noted above, on September 24, 2021, the Chancery Court held that: "The Court's interpretation of the plain meaning of [the Reentry Success Act's] language is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date." *See* Doc. 1-2 at 8. Even so, the Defendants did not afford Mr. Hughes "parole consideration *upon* reaching" his September 30, 2021 release eligibility date. Instead, the Board delayed scheduling a Reentry Success Act-compliant hearing for Mr. Hughes until "11/29/2021"—two months *after* he reached his release eligibility date. *See* Doc. 1-5. Despite failing even to attempt to meet their burden of overcoming his presumptive right to release at that belated hearing, the Defendants also "caused the Plaintiff to remain incarcerated until December 27, 2021." *See* Doc. 1 at 2, ¶ 4.

Put another way: Even with respect to Mr. Hughes, specifically; the specific facts

underlying his claim; and following a final merits decision from a reviewing court establishing—on September 24, 2021—that Mr. Hughes was entitled to "parole consideration *upon* reaching" his September 30, 2021 release eligibility date, *see* Doc. 1-2 at 8, the Defendants continued to violate Mr. Hughes' clearly and even specifically-as-to-him established rights through December 27, 2021. They also did so because they were occupied attempting—unsuccessfully—to advance a new and different theory for convincing the Chancery Court to deny Mr. Hughes relief in the meantime. *See generally* **Ex. #3**. Accordingly, qualified immunity is inapplicable here, given the granular specificity of the clearly established rights that the Defendants resolved to violate. The Defendants' qualified immunity claim should be denied as a result.

**E.**     <u>Mr. Hughes has pleaded sufficiently specific allegations supporting his already-adjudicated Due Process claim with respect to each Defendant.</u>

The Defendants conclude by contending that the "Plaintiff's allegations against the individual Board members named as Defendants in this action fail to link specific Defendants to any specific actions or omissions that support Plaintiff's claims." *See* Doc. 22 at 17. As a consequence, the Defendants insist that Mr. Hughes' Complaint should be dismissed for failure to state a claim upon which relief can be granted.

For several reasons, the Defendants' throwaway 12(b)(6) claim is unserious. Each Defendant is individually named and identified as a party that—as another court has already determined in a final merits ruling against each Defendants' privy under the same facts—"'denied Mr. Hughes the opportunity to exercise his substantive rights at a meaningful time and in a meaningful manner as due process requires.'" *See* Doc. 1, at 3–4, ¶¶ 7–12 (quoting Doc. 1-2 at 9); *id.* at 7 ¶ 33 ("Each Defendant is a member of—and in privity with—the Tennessee Board of Parole, which was the Respondent in Davidson County Chancery Court Case No.: 21-0618-II, *Jeffrey Wayne Hughes v. Tennessee Board of Parole*."). The Plaintiff's Complaint also alleges

-24-

with specificity that "the Defendants did not cause Mr. Hughes to be released on parole upon reaching his release eligibility date on September 30, 2021" as the law required them to do. *See id.* at 8, ¶ 34. Through several dozen specific allegations, Mr. Hughes also alleges why. The Plaintiff's Complaint further alleges what each Defendant *did* do; specifically: "issued a Parole Certificate that prevented Mr. Hughes from being released until '12/27/2021,' *see* [Doc. 1-7]—thereby depriving Mr. Hughes of the opportunity to spend Christmas with his family." *Id.* at 8, ¶ 35.

Under these circumstances, the Defendants—who have already had a full and fair opportunity to litigate the Due Process claim presented in this case and lost it on the merits thereafter—are appropriately on notice of the due process claim asserted against them here. That claim also is not merely one upon which relief *can* be granted; it is a claim upon which their liability *has been* determined already, leaving the damages due to Mr. Hughes as the only real issue left to resolve. *See* Doc. 1-2 at 8–9 (holding that the Defendants' actions were "inconsistent with all principles of due process and of the obligation of the State to follow the laws of the State of Tennessee as well as its own rules," and that the Defendants' actions "denied Mr. Hughes the opportunity to exercise his substantive rights at a meaningful time and in a meaningful manner as due process requires.") (cleaned up). Consequently, because each Defendant's involvement in violating Mr. Hughes' right to due process is sufficiently pleaded, and because each Defendant is fairly on notice of Mr. Hughes' already-once-adjudicated due process claim against them, the Defendants' Motion to Dismiss should be denied.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (Doc. 21) should be **DENIED**.

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay Smith, BPR # 035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2022, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF to:

DEAN S. ATYIA BPR # 039683
Team Leader
Assistant Attorney General
CODY N. BRANDON BPR # 037504
Assistant Attorney General
Law Enforcement and
Special Prosecutions Division
Office of the Tennessee
Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-1982
Fax: (615) 532-4892
Dean.Atyia@ag.tn.gov
Cody.Brandon@ag.tn.gov

*Counsel for Defendants*

By:     /s Daniel A. Horwitz_____