UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| JEFFREY HUGHES, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | No. 3:22-cv-00238 |
| ZANE DUNCAN, GARY M. FAULCON, TIM GOBBLE, MAE BEAVERS, ROBERTA NEVIL KUSTOFF, and BARRETT RICH, | ) |  |
| Defendants. | ) |  |

## MEMORANDUM OPINION

While Jeffrey Hughes was serving a 27-year sentence in the Tennessee Department of Corrections, the Reentry Success Act of 2021 was passed by the General Assembly. That Act amended the parole eligibility requirements set forth in Tennessee Code Annotated § 40-35-503 by providing that "there is a presumption that an eligible inmate must be released on parole, except for good cause shown, upon the inmate reaching the inmate's release eligibility date or any subsequent parole hearing." 2021 Tenn. Pub. Acts, ch. 410, § 12. Because Hughes was eligible for release on September 30, 2021, but was not released until December 27, 2021, and because he alleges good cause was not shown for that delay, he sues each member of the Tennessee Board of Parole ("Board") in their individual capacity under 42 U.S.C. § 1983. Hughes seeks damages "in an amount of not less than $1 million," plus attorney's fees and costs for the violation of his constitutional right to procedural due process and for having to spend an additional three months in prison. (Doc. No. 1 at 12). Defendants now move to dismiss the Complaint. (Doc. No. 21).

## I. Factual Background

On July 22, 2020, the Board held an initial parol hearing for Hughes, denied parole, and set the next hearing for sometime in July 2022. However, based on the Reentry Success Act, Hughes submitted a petition to the Board on June 21, 2021, requesting that he be given another parole hearing before his eligible release date. The Board took the position the Act did not apply retroactively, with counsel for the Board explaining:

> The Reentry Success Act applies to parole determinations made on or after the effective date. It does not retroactively apply such that the Board must rehear the thousands of offenders that were previously heard and declined but may be eligible under the Act upon reaching their review dates. Unfortunately, the Board does not have the ability or resources necessary to identify and reconsider all of those cases including Mr. Hughes.

(Doc. No. 1-2 at 3-4).[1] On June 23, 2021, two days after the petition was filed, counsel for Hughes appeared at an administrative meeting of the Board and requested that the Board "afford Mr. Hughes a parole hearing before his eligible release date in compliance with the Reentry Success Act of 2021." (Id. at 4). The Board took no action on that request and was not scheduled to meet again until January 26, 2022 – months after Hughes' eligible release date. (Id.).

Hughes then filed a Writ of Certiorari petition with the Davidson County Tennessee Chancery Court "seek[ing] a review of the Board's action, or lack thereof, at the June 23, 2021 meeting when asked to set a parole hearing for Mr. Hughes consistent with his release eligibility date." Id. at 6. On September 24, 2021, Chancellor Martin entered a decision in Hughes' favor.

---

[1] The foregoing facts are drawn from Davidson County Chancellor Anne C. Martin's Memorandum and Order in Hughes v. Tenn. Bd. of Parole, 21-618-II (Chan. Ct., 9/24/2021). Because that decision is attached to the Complaint, integral to Hughes's claims, and "there exist no material disputed issues of fact regarding the relevance of the document," the Court can consider it in ruling on the motion to dismiss, without converting it to a motion for summary judgment. Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 797 (6th Cir. 2012)

Acknowledging that "the Act constitutes a sea change in how parole matters are to be handled in Tennessee for eligible inmates," and recognizing the Board's concern that retroactive application of the Act 'will require it to set hearings for inmates who have upcoming release eligibility dates outside of the ordinary course of the hearing schedule," Chancellor Martin nevertheless found that eligible inmates "are entitled to a parole hearing within a reasonable time of their release eligibility date, as well as a presumption of parole release except for good cause shown, which must be reduced to writing with an explanation regarding what the inmate can do to improve his or her chances." (Id. at 8, 9) (citing Tenn. Code Ann. § 40-35-503(i) & (j)). More specifically, Chancellor Martin ruled that the "plain meaning" of language of the Act "is that an eligible inmate is entitled to parole consideration *upon* reaching his or her release eligibility date." Id. at 8 (citation omitted, emphasis in original). To hold otherwise, in her opinion, would be "inconsistent with all principles of due process and of the obligation of the State to 'follow the laws of the State of Tennessee as well as its own rules, and that inmates are entitled to whatever due process arises as a result of the proper application of state statutes and the rules.'" (Id. at 7-8) (quoting Greenwood v. Tenn. Bd. of Parole, 547 S.W.3d 207, 214-15 (Tenn. Ct. App. 2017)).

As it pertained to Hughes, Chancellor Martin found that:

> the Board failed to adhere to the requirement of the Act, codified at Tenn. Code Ann. § 40-35-503(i) and (j), when it denied Mr. Hughes' June 23, 2021 request for a parole hearing earlier than July of 2022 and in reasonable proximity to his release eligibility date. The Board's action denied Mr. Hughes the opportunity to exercise his substantive rights at a meaningful time and in a meaningful manner as due process requires.

(Id. at 9). Accordingly, she remanded the matter to the Board to set a parole hearing within sixty days of Hughes' release eligibility date. (Id. at 10). The Board did not appeal Chancellor Martin's

decision.

On November 29, 2021, the Board held a hearing and found that Hughes was eligible for parole. However, the Parole Certificate issued by the Board, stated that Hughes was not entitled to release until December 27, 2021, and he was paroled from the Department of Corrections on that date.

## II. Discussion

Defendants move to dismiss on three grounds. First, as parole board members, they assert that they are entitled to absolute immunity. Second, even if absolute immunity does not apply, Defendants contend that they are entitled to qualified immunity. Third, Defendants argue that because "the complaint contains essentially no allegations of any individual actions of Defendant," it fails to state a claim on which relief can be granted within the meaning of Rule 12(b)(6) of the Federal Rules of Civil Procedure.

After thorough review of the filings, the Court finds that Defendants are entitled to immunity and, therefore, need not reach Defendants' alternative argument that the Complaint lacks sufficient allegations to state a claim. Prior to reaching the immunity issues, however, the Court must first address Hughes' contention that the immunity defenses are barred by res judicata or judicial estoppel based upon the proceedings before Chancellor Martin.

### A. Res Judicata

"It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). Consequently, "[i]n deciding whether res judicata or the full faith and credit statute lend preclusive effect to a

4

particular state court decision, federal courts look to the state's law to 'assess the preclusive effect it would attach' to that decision." Gutierrez v. Lynch, 826 F.2d 1534, 1537 (6th Cir. 1987); see also Burda Bros., Inc. v. Walsh, 22 F. App'x 423, 429–30 (6th Cir. 2001) ("Federal courts must apply state collateral estoppel law when determining whether a state court's judicial determination has preclusive effect in a particular § 1983 action.") "An analysis of res judicata or collateral estoppel by a prior state court proceeding in a federal § 1983 action must thus begin with a consideration of whether relitigation of the issue or claim would be barred under state law." Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities, 825 F.2d 946, 965 (6th Cir. 1987). Nevertheless, "federal law then provides a check on the state process by requiring that the party against whom the earlier decision is asserted has had a 'full and fair opportunity' to raise or litigate the issue decided by the prior state court litigation." Id. (citing Haring v. Prosise, 462 U.S. 306, 313(1983); Allen v. McCurry, 449 U.S. 90, 102 (1980)).

Under Tennessee law, "[t]he party asserting a defense predicated on res judicata or claim preclusion must demonstrate (1) that the underlying judgment was rendered by a court of competent jurisdiction, (2) that the same parties or their privies were involved in both suits, (3) that the same claim or cause of action was asserted in both suits, and (4) that the underlying judgment was final and on the merits." Jackson v. Smith, 387 S.W.3d 486, 491 (Tenn. 2012) (citing Lien v. Couch, 993 S.W.2d 53, 56 (Tenn. Ct. App.1998)). "A party asserting a res judicata defense may generally prove its defense with a copy of the judgment in the former proceeding." Regions Bank v. Prager, 625 S.W.3d 842, 848 (Tenn. 2021).

Here, Hughes relies upon Chancellor Martin's Memorandum Opinion, but that decision fails to establish either the second or third elements necessary for res judicata. As for the second element,

5

Hughes also cites his own Complaint to show privity, even though the Defendant in the Chancery Court was the "Tennessee Board of Parole Board," and the Defendants here are the Board members in their individual capacities. This is a distinction with a huge difference. Hughes's position would require the Court to adopt "a transitive theory of capacities," Goldstein v. Galvin, 719 F.3d 16, 23–24 (1st Cir. 2013), while at the same time ignoring the rule of differing capacities.

In the context of claim preclusion and res judicata, "privity . . . means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." Sanders Confectionery Prods., Inc. v. Heller, 973 F.2d 474, 481 (6th Cir.1992). However, "the rule of differing capacities provides that "[a] party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity.'" Mitchell v. Chapman, 343 F.3d 811, 823 (6th Cir. 2003) (quoting Restatement Second of Judgments § 36(2) (1982)). "The theory behind that rule rests on a legal fiction about individuals having two separate identities: one identity (or capacity) as an official representative of either the government or a corporation; and a separate identity (or capacity) as an individually autonomous human being." Brooks v. Arthur, 626 F.3d 194, 201 (4th Cir. 2010). As the First Circuit has cogently explained:

> [O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. In other words, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. This means, of course, that a public official, sued only in his official capacity, is a proxy for the government entity that employs him and is in privity with that entity. The situation is quite different when an official is sued in his individual capacity. By definition, such a suit takes aim at the individual, not the government entity with which he is associated. Such a defendant is, therefore, not considered to be in privity with the government entity.
>
> The flipside of this coin is that a person sued in his official capacity is a different

party, in contemplation of law, than the same person sued in his individual capacity. It follows inexorably that a person sued only in his official capacity is neither identical to, nor in privity with, the same person sued in his individual capacity.

Goldstein, 719 F.3d at 23. In sum, "[t]he rule of differing capacities is generally understood to mean that defendants in their official and individual capacities are not in privity with one another for the purposes of res judicata." Brooks, 626 F.3d at 201. Such is the case here.

Hughes' invocation of res judicata is also improper because he has failed to show that the same claim or cause of action asserted in the Chancery Court is now being asserted here. The claim in the Chancery Court was brought by a "common law writ of certiorari" that, according to Chancellor Martin, provides a "scope of review" limited to "whether the decision maker (1) exceeded its jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support its decision." (Doc. No. 1-2 at 6). More specifically as it pertained to Hughes, Chancellor Martin framed the issue before her as follows:

> Mr. Hughes contends that the Board acted arbitrarily, capriciously, and illegally in failing to follow the Act and denying him the opportunity to have a parole hearing date within a reasonable time of his upcoming parole eligibility date. Thus, Mr. Hughes' petition rises and falls upon the interpretation of the Act as codified at Tenn. Code Ann. § 40-35-503(I) and (j), and, specifically, whether the change in the parole eligibility process requires the Board to set a parole hearing consistent with an inmate's release eligibility date.

(Id.). Here, of course, the issue is not whether the Board acted arbitrarily, capriciously, or illegally under the terms of the Act. Rather, the issue is whether the individual members of the board violated Hughes' constitutional rights. Res judicata does not apply.

B. **Judicial Estoppel**

Unlike with res judicata, "[f]ederal standards govern the application of judicial estoppel in

7

federal court . . . because the doctrine is designed to protect the integrity of judicial institutions, and because the question (when presented in federal court) primarily concerns federal interests. Warda v. Comm'r, 15 F.3d 533, 538 (6th Cir. 1994); see also Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, 855 F. App'x 239, 243 (6th Cir. 2021) ("Although this case is being heard in diversity jurisdiction, we use principles of federal law in deciding whether to apply judicial estoppel."); In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig., 546 F. Supp. 3d 679, 691 n.3 (S.D. Ohio 2021) ) (collecting cases for the proposition that "[c]ourts in this circuit apply federal law applying the doctrine of judicial estoppel").  The doctrine is "utilized in order to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" Browning v. Levy, 283 F.3d 761, 775 (6th Cir.2002).  Even so, judicial estoppel "should be applied with caution to 'avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.'" Eubanks v. CBSK Fin. Grp., Inc., 385 F.3d 894, 897 (6th Cir. 2004) (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir.1990)).

"In light of the policies underpinning judicial estoppel, the rule cannot be applied in a subsequent proceeding unless a party has successfully asserted an inconsistent position in a prior proceeding." Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982).  Thus, "[w]hen a party convinces a court to take a certain position, and later advocates an inconsistent position, the court can apply the doctrine of judicial estoppel to prevent that party from playing 'fast and loose' with the courts." Han v. Hankook Tire Co., 799 F. App'x 347, 349 (6th Cir. 2020).

Even leaving aside Defendants' primary contention that they are immune from suit on Hughes's Section 1983 claim for monetary damages, Hughes has not shown that the position taken

8

here is inconsistent with the one taken by the Board in the Chancery Court. While the *Board* argued before the Chancery Court that there was no "parole decision" subject to review, this is not inconsistent with the *individual* Defendants' present argument that the scheduling of a hearing is protected by immunity. And, even if Defendants' present arguments could somehow be characterized as inconsistent with the Board's prior argument about whether there was a "parole decision," res judicata would not apply because Chancellor Martin actually rejected the Board's assertion that there was no "parole decision" to review.

Regardless," judicial estoppel 'is an equitable doctrine invoked by a court at its discretion." New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)). The Court will not invoke that doctrine here because there is nothing to suggest that Defendants are attempting to thwart the judicial process through "cynical gamesmanship" or by playing "fast and lose" with the courts. Rather, Defendants are invoking appropriate defenses to a Section 1983 action.

## C. Absolute Immunity

Judges are immune "from liability for damages for acts committed within their judicial jurisdiction." Pierson v. Ray, 386 U.S. 547, 553–54 (1967). "[T]he absolute immunity that protects judicial officers engaged in judicial functions also protects other state officials engaged in adjudicative functions." Dean v. Byerley, 354 F.3d 540, 555 (6th Cir.2004); see also Foster v. Walsh, 864 F.2d 416, 417 (6th Cir.1988). This immunity, in the form of quasi-judicial immunity, "extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." Bush v. Rauch, 38 F.3d 842, 847 (6th Cir.1994).

9

Although the Supreme Court has yet to directly address the issue, the Sixth Circuit, in a number of unpublished and table decisions, has stated that parole board members are absolutely immune from suit for monetary damages under Section 1983 for actions taken in the performance of their duties. See, e.g., Draine v. Leavy, 504 F. App'x 494, 495 (6th Cir. 2012); Horton v. Martin, 137 F. App'x 773, 775 (6th Cir. 2005); Hawkins v. Morse, 194 F.3d 1312 (6th Cir. 1999); Tillman v. Price, 113 F.3d 1236 (6th Cir. 1997); Ward v. Moss, 42 F.3d 1390 (6th Cir. 1994); Howard v. Hughes, 876 F.2d 894 (6th Cir. 1989); Carson v. Michigan Parole Bd., 852 F.2d 1287 (6th Cir. 1988). This is in keeping with the weight of published decisions from other Circuit Courts of Appeal, at least to the extent that the parole board or its members are performing "judge-like" functions. See, e.g., Figg v. Russell, 433 F.3d 593, 598 (8th Cir. 2006); Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999); Fuller v. Georgia State Bd. of Pardons & Paroles, 851 F.2d 1307, 1310 (11th Cir. 1988); Farrish v. Mississippi State Parole Bd., 836 F.2d 969, 973 (5th Cir. 1988); Johnson v. Rhode Island Parole Bd. Members, 815 F.2d 5, 8 (1st Cir. 1987); U. S. ex rel. Powell v. Irving, 684 F.2d 494, 497 (7th Cir. 1982); Sellars v. Procunier, 641 F.2d 1295, 1299 (9th Cir. 1981).

The essence of Hughes' complaint is that, in contravention of the newly-enacted Reentry Success Act, the Parole Board refused to either release him on his eligible release date or schedule a hearing by that date. However, "scheduling a case for hearing is part of the routine procedure in any litigated matter[,]" Thompson v. Duke, 882 F.2d 1180, 1184 (7th Cir.1989) and "[t]hus, judicial immunity forecloses [plaintiff's] claim based on [a judge's] alleged failure to hold a hearing, Deelen v. Fairchild, No. 05-3468, 2006 WL 2507599, at *3 (10th Cir. Aug. 31, 2006). Indeed, the manner in which a hearing is set or not set is "irrelevant" inasmuch as such actions or inactions "are no less judicial . . . because they may have been committed in error." Buckwalter v. Nevada Bd. of Med.

10

Examiners, 678 F.3d 737, 746 (9th Cir. 2012). This immunity extends to parole boards and its members who fail to set or schedule a timely parole hearing. Fort v. Washington, 41 F.4th 1141, 1146 (9th Cir. 2022); Thompson, 882 F.2d at 1184; Cox v. Indiana, No. 117CV00226LJMTAB, 2017 WL 365754, at *2 (S.D. Ind. Jan. 25, 2017); Pate v. United States, 277 F. Supp. 2d 1, 11 (D.D.C. 2003). More fundamentally, this immunity extends to the decision whether to grant, deny, or revoke parole. See e.g., Tobey v. Chibucos, 890 F.3d 634, 650 (7th Cir. 2018); Swift v. California, 384 F.3d 1184, 1189 (9th Cir. 2004) Montero, 171 F.3d at 761; Sellars, 641 F.3d at 1303.

In a "Notice of Filing" tendered weeks after the Motion to Dismiss was fully briefed, Plaintiff cites Stanley v. Patterson, No. S21G0405, 2022 WL 4349306 (Ga. Sept. 20, 2022) as "recent persuasive authority" for the proposition that the "Georgia Supreme Court cogently explains why botching a ministerial duty that results in a person's improper incarceration is not an act that is protected by judicial immunity." (Doc. No. 29 at 1). However, Hughes' reliance on Stanley takes as a fact that setting or failing to set a hearing was a "ministerial act," something that was not even an issue in that case. Rather, the issue there was whether a court administrator and two municipal court case managers were entitled to quasi-judicial immunity for "removing or failing to remove an order from a stack of case files," with the Georgia Supreme Court finding they were not because it was "a mere physical task requiring no 'discretionary judgment' that is 'functionally comparable to those made by judges." Id. at 2. Even so, however, the court left it to the trial court to determine whether the defendants might still be protected by "official immunity." Id. at 3. Stanley is not controlling, inapposite, and of no help in deciding the issue here.

D. **Qualified Immunity**

"Qualified immunity shields government officials in the performance of discretionary

11

functions from standing trial for civil liability unless their actions violate clearly established rights." DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 608 (6th Cir. 2015). Once the defense is raised, a plaintiff must come forward with evidence from which a jury could find "(1) that the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Both prongs must be met, and judges "can exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Exercising that discretion here, the Court considers the second prong first and concludes that Hughes has wholly failed to establish that the law was "clearly established" under the circumstances of this case.

"'[C]learly established law should not be defined at a high level of generality'– it 'must be particularized to the facts of the case.'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal citations and quotation marks omitted). This does not require a plaintiff to identify an earlier decision that is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al–Kidd, 563 U.S. at 741). "[T]his narrow definition of 'clearly established' functions to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Mitchell v. Schlabach, 864 F.3d 416, 424 (6th Cir. 2017) (quoting Mullenix, 136 S. Ct. at 308). It also serves to protect "reasonable" but "mistaken" decisions by officials acting in good faith. Hunter v. Bryant, 502 U.S. 224, 229 (1991).

It is the plaintiff's burden to show "that the right was 'clearly established' at the time of the challenged conduct." al-Kidd, 563 U.S. at 735 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In the absence of a clear constitutional violation, the decision as to whether existing legal

12

authority has placed the statutory or constitutional question beyond debate is determined by looking first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal. Barber v. Miller, 809 F.3d 840, 845 (6th Cir. 2015); Flint v. Kentucky Dep't of Corr., 270 F.3d 340, 347 (6th Cir. 2001).

In his response, Hughes argues that "the Reentry Success Act required the Defendants either: (1) to hold a hearing and establish 'good cause' to overcome the 'presumption that [he] must be released on parole" upon reaching his September 30, 2021 release eligibility date, see Tenn. Code Ann. § 40-35-503(i)(1); or (2) to release [him] on parole upon reaching his September 30, 2021 release eligibility date." (Doc. No. 23 at 17). Because, however, Defendants did neither, Hughes claims that they violated his "clearly established constitutional right to due process of law[.]" (Id. at 16). More specifically, he argues that (1) the Sixth Circuit in Mayes v. Trammell, 751 F.2d 175, 179 (6th Cir. 1984) "clearly established that a statutory presumption of parole upon an inmate reaching his release eligibility date is a protected liberty interest that can only be denied in a constitutionally compliant hearing"; (2) Greenwood v. Tenn. Bd. Of Parole, 547 S.W.3d 207, 215 (Tenn. Ct. App. 2017) holds "the Tennessee Court of Appeals has long 'determined that the Board of Paroles is obligated to follow the laws of the State of Tennessee as well as its own rules, and that inmates are entitled to whatever due process arises as a result of the proper application of the state statutes and the rules"; (3) the Board years ago amended its rules to get around Mayes's holding that a presumption of parole created a liberty interest; and (4) the Reentry Success Act of "served to reinstate the presumption of parole." (Id. at 16). Consequently, according to Hughes, because Tennessee law has effectively reverted to the Mayes era by again making parole a liberty interest, it follows that the law is, once again, clearly established by Mayes.

13

Merely to state Hughes' argument is to show that the law is far from clearly established for purposes of the qualified immunity analysis. Were Hughes' arguments based upon the law that existed when Mayes was decided almost four decades ago, he would be right that qualified immunity would not be a defense. Cf. Crawford v. Tilley, 15 F.4th 752, 766 (6th Cir. 2021) ("[A] complaint distinguishable from our past cases on its face will not often survive a motion to dismiss on qualified immunity grounds."). The Reentry Act of 2021, however, is an entirely new law and it certainly did not make Mayes "existing precedent [that] placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). Indeed, so far as the Court can tell, Chancellor Martin was the first jurist to interpret the Act and what it meant in terms of due process. It certainly was not incumbent upon Defendants to predict how she would rule at the risk of losing qualified immunity. See Wilson v. Layne, 526 U.S. 603, 617 (1999) ("Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.'"); Henderson Amusement, Inc. v. Good, 59 F. App'x 536, 541 (4th Cir. 2003) ("[I]f the contours of the right have not been 'authoritatively decided' by the Supreme Court, Court of Appeals, or state supreme court, the law enforcement officer is entitled to qualified immunity."); Lee v. Dugger, 902 F.2d 822, 824 (11th Cir.1990) ("Here, only one case, decided by an intermediate appellate court, had construed the new statute, which falls short of the clarity of the law required to defeat a defense of qualified immunity.")

The Court also rejects Hughes' claim that qualified immunity should not attach because Defendants kept him "imprisoned without even attempting to meet its evidentiary burden at a hearing once he reached his release eligibility date" and this was "not plausibly within the scope of Defendants' discretion." (Doc. No. 23 at 18). While Hughes's eligible release date was September

30, 2021 and the hearing was not held until November 29, 2021, holding the hearing on that date was entirely in keeping with Chancellor Martin's ruling that the Board "was required to set a parole hearing for Petitioner within sixty (60) days of his release eligibility date," which she determined "for purposes of [her] Order" to be September 30, 2021. Defendants cannot be faulted or found liable under Section 1983 for following the Chancery Court's ruling about when a hearing needed to be set.

### III. Conclusion

For the foregoing reasons, Defendants' Amended Motion to Dismiss will be granted and this case will be dismissed.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE